OPINION OF THE COURT
James W. Hubert, J.
By motion before this court, the above-captioned defendants seek summary judgment against the above-captioned plaintiff dismissing all three of plaintiffs causes of action as alleged in the verified complaint filed on or about December 8, 2010. Discovery in the action has been concluded and note of issue previously filed and served by and upon the parties. This court has examined and considered the pleadings, as well as the defendants’ motion (with affirmations and exhibits, memorandum and reply memorandum of law), plaintiffs affirmation in opposition (with affirmations and exhibits, and memorandum of law) and all proofs submitted. The determination of the court is as follows.
Undisputed Factual Pleadings, Averments and Affirmations
The plaintiff JJLG Motors, Inc. (JJLG) is a franchised retail motor vehicle dealer for Chrysler, Jeep and Dodge brand motor vehicles, doing business as Croton Auto Park in the Village of Croton-on-Hudson, Westchester County, New York. Of relevance to the instant matter, JJLG markets and sells, inter alla, a vehicle known as the Dodge Challenger.
*1038 The defendants, who are collectively referred to herein as SMS, are based in California and are parent and/or affiliate companies of one another. SMS, through the various affiliates, designs, assembles, distributes, markets and sells certain high-performance automobiles which are derived from select new stock motor vehicles produced by, and sold through, Chrysler (Dodge), Ford and Chevrolet (General Motors). There are basically three iterations of SMS produced vehicles: the Saleen Ford Mustang, Saleen Chevrolet Camaro, and Saleen Dodge Challenger.[1]
The defendants modify and customize the selected vehicle by rebuilding it “from the chassis up” (Saleen off 1i 2). Exterior body panels and colors, interior seats and trim, mechanical components (brakes, engine and suspension), are all modified, and, in some cases, replaced entirely with parts manufactured or supplied by SMS. A Saleen version of the stock vehicle can be ordered by a customer directly from SMS, or indirectly through a Chrysler, Ford, or Chevrolet dealer that has a business relationship with SMS (Saleen off 1! 4). In all cases, however, the vehicle is sold and delivered to the customer through a Chrysler, Ford or Chevrolet dealership (depending on the Saleen model purchased) located within reasonable proximity of the customer (or as agreed to by the customer) after assembly by SMS at its California facility.
In that regard, it was not uncommon for SMS to enter into business relationships with Chrysler, Ford or Chevrolet dealers in order to promote, sell and distribute the Saleen versions of the three cars. It is just such a transaction which gave rise to the instant matter before the court.
In January of 2010, the plaintiff and defendants entered into an agreement whereby JJLG would purchase from SMS a number of so-called “Saleen 570/570x Challengers” (totaling five over the course of the year at specific intervals) and other related parts. In exchange, assuming JJLG could sell the five units within the year, it would be the only dealer in Westchester, Putnam and Rockland Counties (a very large geographic area) authorized to sell the Saleen Challenger and related Saleen parts and accessories. The agreement term was one year “extendable.”
*1039 Other aspects of the agreement, relevant to the instant motion, included the requirement that JJLG purchase five superchargers at a price 20% below retail during the year. Exclusivity was further contingent upon JJLG’s formulation of a “detailed marketing and stocking plan” subject to SMS’s approval. This plan would include “performance metrics and stocking;” as well as promotional activities through “media” and “showroom, service and performance-oriented activities” all designed to “promote [JJLG] as the source for SMS Super-cars in the assigned area.” Further details regarding what the marketing/stocking plan should look like and contain were not set forth within the contract; however SMS could not “unreasonably” withhold its approval of any such plan formulated by JJLG.
The agreement was entitled “Wholesale Exclusive Agreement” and listed SMS Retail-Corona as the seller/wholesaler, and Croton Auto Park as the dealer/retailer. There were no specific references or use of the terms franchise, franchisor or franchisee anywhere in the agreement. There is no indication in the record that SMS registered or was registered as a franchise, franchisor or franchisee.
By April of 2010, SMS had delivered the first Saleen 570 Challenger. Almost immediately JJLG alleged numerous problems with the car. The problems fell basically in three categories: mechanical (difficult or “hard” engine start); excessive mileage (239 odometer miles); and cosmetic fit and finish (misaligned body panels, paint flaws, upholstery flaws).[2]
Acknowledging the problems, SMS made certain offers to mitigate them (exhibit D annexed to the defendants’ motion). The mitigations were apparently unacceptable to JJLG. The plaintiff insisted (and has pleaded) that the defendants must buy the car back as mandated under, and in accord with, New York’s Franchised Motor Vehicle Dealer Act, Vehicle and Traffic Law, article 17-A, § 463 (2) (p).
The Legal Issues
The act dates back to 1984, and has been amended numerous times over the intervening years. The general purpose of the act was (and is)
“to regulate motor vehicle manufacturers, distribu *1040 tors and. factory or distributor representatives and to regulate dealers of motor vehicles doing business in this state in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state.” (Vehicle and Traffic Law § 460.)
The definitional terms under Vehicle and Traffic Law § 462 reference and define a number of different persons and entities, including: distributor; distributor branch; distributor representative; factory branch; factory representative; franchise; franchised motor vehicle dealer; franchisor; manufacturer. (See Vehicle and Traffic Law § 462 [l]-[8], [9].) By themselves, however, the terms as listed in section 462 impart no rights, duties, liabilities or causes of action. It is the other sections of the act, and how those terms are incorporated within each of those sections, that give the requisite context and define what is actionable under the act and under what circumstances.
When read as a whole, it is clear that the act primarily addresses and governs (nearly to the point of exclusion of any of the other persons or entities listed within Vehicle and Traffic Law § 462)[3] transactions and interactions between and among franchisors and franchisees. Because the act is directed, almost exclusively, toward governing franchisors and franchisees, there are certain thresholds that must be met in order for a prospective litigant to plead and prove a cause of action under the act. (See e.g. Tri-County Motors, Inc. v American Suzuki Motor Corp., 494 F Supp 2d 161, 176 [ED NY 2007] [because plaintiff TriCounty Motors was, at no time, a franchised motor vehicle dealer it had no standing to sue under the act].)
The threshold in the instant case is whether the agreement creates a franchise (as defined under Vehicle and Traffic Law § 462 [6]) between SMS as franchisor (as defined under Vehicle and Traffic Law § 462 [8]) and JJLG as franchisee (as defined under Vehicle and Traffic Law § 462 [7]) with respect to the sale of Saleen Challenger cars, including the vehicle in question. Because the instant matter is not pleaded as a breach of contract, but rather purely as a violation of the act by the SMS defendants in derogation of JJLG’s rights under the act, the *1041 sustainability of the lawsuit rests on this court’s resolution of this threshold, question.[4]
Under the act, “Franchise motor vehicle dealer” is defined as: “any person required to be registered pursuant to section four hundred fifteen of this title which has been granted a franchise as defined in subdivision six of this section” (Vehicle and Traffic Law § 462 [7] [a]). The plaintiff has so pleaded and the defendants dispute only that the plaintiff is SMS’s franchise motor vehicle dealer.
“Franchisor” is defined as: “any manufacturer, distributor, distributor branch or factory branch, importer or other person, partnership, corporation, association, or entity . . . which enters into ... a franchise with a franchised motor vehicle dealer.” (Vehicle and Traffic Law § 462 [8].) The plaintiffs pleadings aver that SMS is its franchisor. The defendants deny any franchise relationship, but at a minimum, SMS is a manufacturer[5] and is certainly a corporation. Whether SMS has “enter[ed] into ... a franchise [with the plaintiff],” and thus become plaintiff’s franchisor, is the question this court must determine. (Id.)
Under the act, the terms “franchisor” and “franchise motor vehicle dealer” have no independent meaning outside of a franchise relationship between the parties. In other words, there must be a franchise agreement (and it must be in writing) for an entity to be considered either a franchisor or franchise motor vehicle dealer under the act. (Vehicle and Traffic Law § 462 [6].) The central question, therefore, in the instant matter, is whether the Wholesale Exclusive Agreement is really a franchise agreement. The starting point of that inquiry is the definition of the term “Franchise” under Vehicle and Traffic Law § 462 (6).
Franchise is defined in the act as:
“a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, by lease or *1042 otherwise and/or pursuant to which a franchised motor vehicle dealer purchases and resells or offers (as agent, principal, or otherwise) products associated with the name or mark or related components of the franchise.” (Id.)
Both sides agree that the express terms of the agreement did not reference or use the term “franchise.” It was a 2[1]/2-page document that, in very simple terms and for a period of one year, gave JJLG the right to sell five Saleen Challengers and superchargers without any competition from other Dodge dealers in Westchester and two other adjoining counties. After that, the arrangement could be extended provided JJLG had hit its sales marks on the five Saleen Challengers during the term of the contract. There is no reference to establishing a franchise or reference to the Franchised Motor Vehicle Dealer Act anywhere in the agreement. The first such reference appears in the verified complaint filed in the instant action.
The parties, themselves, are experienced car vendors. Plaintiff avers it is, and has been, a franchised Chrysler dealership prior to the events leading up to the instant matter. Presumably, JJLG has been through the franchising process at least once before entering into its agreement with SMS. Similarly, the defendants proudly proclaim their status among “ ‘muscle’ car and racing enthusiasts,” their cars having been featured prominently in motion pictures (Saleen off H 3). Is it unreasonable to expect the parties to have stated, expressly, those terms which are wholly absent from the agreement if, indeed, franchise was their intent? This court does not, and will not presume naiveté, in that regard, on the part of either side to the controversy.
Whether a contract is ambiguous is, generally, a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous. (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 278 [2005].) Are the terms of the contract ambiguous? They do not appear to be. In addition to the absence of the term “franchise,” there is no reference to, or use of, the terms “license” or “community of interest,” in any part of the agreement. All three terms are prominently referenced in the act under section 462 (6).
The construction of contracts requires that the court give the language and terms their plain and ordinary meaning. (White v Continental Cas. Co., 9 NY3d 264, 267 [2007].) What state of facts within or without the terms of the contract, compels the *1043 court to infer a bilateral intent to create a franchise through the agreement? There are no letters, emails, correspondence or alleged conversations between the parties suggesting they contemplated, much less agreed to create, a franchise relationship. (See e.g. Yanuck v Paston & Sons Agency, 209 AD2d 207 [1st Dept 1994] [sales agreement, while silent on plaintiffs accrued claims to shared profits, nevertheless references the prior Joint Venture Agreement — which included shared profits — and is therefore susceptible to the parties’ varying interpretations and precludes summary judgment on the question of whether the sales agreement extinguished claims to said profits].)
However, it is also true that there are no express requirements under the act obliging the parties to label any agreement purporting to create a franchise as such. Vehicle and Traffic Law § 462 (6) uses the term “written arrangement” to express the writing requirement. What document or combination of documents might constitute a “written arrangement,” under the act, is unknown. If the agreement, as its terms are expressed and strictly construed within the four corners of the contract, fits within the definition provided under Vehicle and Traffic Law § 462 (6), then the act applies and summary judgment must be denied. Conversely, given the unambiguous nature of the language of the agreement, if it does not fit within Vehicle and Traffic Law § 462 (6) as written, summary judgment must be granted.
No New York State court has weighed in on the issue of how Vehicle and Traffic Law § 462 (6) should or must be interpreted. The plaintiff urges an interpretation hinging upon the conjunctive/disjunctive phrase “and/or,” which appears about two thirds of the way through the definitional paragraph. (Id.) What plaintiff proposes is that the definition, by utilizing the phrase “and/or,” contains two alternative definitions of a franchise: one that is conjunctive (and), and one that is disjunctive (or). When read disjunctively, plaintiff argues the definition must be understood as follows: “ ‘Franchise’ means a written arrangement for a definite or indefinite period . . . pursuant to which a franchised motor vehicle dealer purchases and resells or offers (as agent, principal, or otherwise) products associated with the name or mark or related components of the franchise.” (Plaintiffs mem of law at 9.) Interpreting the disjunctive option any differently, plaintiff asserts, negates the “and/or” language and renders what comes after the word “or” meaningless.
The problem with this construction is that it departs significantly from what the Court of Appeals has set forth *1044 regarding judicial interpretation of the language and punctuation (or lack of punctuation) contained within a statute. In a case cited by plaintiff, the Court of Appeals rejected the plaintiffs construction of General Business Law § 691 (3) noting:
“Common marks of punctuation are used to clarify the writer’s intended meaning and thus form a valuable aid in determining legislative intent ... In this case, punctuation sets off the materially aids clause from all the enumerated categories of persons, indicating it was intended to apply to each one. Because this is a reasonable and workable construction of the statute and because there is no evidence that another meaning was intended, we are not at liberty to simply ignore the Legislature’s punctuation.” (A.J. Temple Marble & Tile v Union Carbide Marble Care, 87 NY2d 574, 581 [1996] [emphasis added].)
Plaintiffs reconstruction of Vehicle and Traffic Law § 462 (6) omits all of the language which follows the words “indefinite period,” and which precedes the conjunctive/disjunctive “and/ or,” to wit:
“ ‘Franchise’ means a written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a franchised motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, by lease or otherwise and/or” (emphasis added [omitted portion in italicized type]).
Plaintiff ignores that the legislature inserted no grammatical pause between the words “indefinite period” and the words “in which a manufacturer [etc.].” Instead, the plaintiff seeks to add (not literally, but by interpretation) a colon after the words “indefinite period.” Contrary to the plaintiffs assertion, the lack of a grammatical pause, such as a colon, suggests the legislature’s intent was not to have the statute read as proposed by the plaintiff.
Furthermore, the interpretation of Vehicle and Traffic Law § 462 (6) urged by plaintiff creates a new problem within the definition. As disjunctively reconstructed by plaintiff, the term “franchise” appears as the last word of the disjoined alternative definition. As a result “franchise” is now undefined because of *1045 the elimination of the phrasing between the words “indefinite period” and the words “pursuant to which.” The key terms, now excluded, are the only terms that could conceivably make a franchise different from just another business relationship. The key terms (italicized, infra) are found in the phrase, “a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto . . . .” (Emphasis added.) These terms, which, per force, must define what constitutes a franchise, are wholly excised from the disjunctive alternative definition proposed by plaintiff. The plaintiff’s alternative definition of “franchise” becomes a tautology: a term which defines itself.[6] That was certainly not the intent of the legislature.
Of necessity, then, analysis of whether the agreement created a franchise between the plaintiff and the defendants requires inquiry into the meaning of the terms “license” and “community of interest.”[7] While no New York State courts have considered these terms and their meaning, there is one federal case out of the Second Circuit that, in dicta, discusses the “community of interest” element. In Arthur Glick Truck Sales, Inc. v General Motors Corp. (865 F2d 494 [2d Cir 1989]) the court overturned the District Court’s grant of summary judgment against the plaintiff truck dealer (who defendant conceded was already its franchise dealer as to certain other G.M. truck lines) *1046 and remanded determination of the issue of the applicability of the act until after completion of discovery stating:
“here there may have been a ‘community of interest in the marketing of heavy-duty trucks and related services. . . . General Motors granted the Glick dealership a license to use its trade name, service mark, or a related characteristic. Heavy-duty trucks are a significant segment of the market.
“Where a dealer has made an investment in parts and training service employees and where the line of trucks is functionally related to a distinct segment of the market, as heavy-duty trucks appear to be, and where their sale constitutes a substantial part of the dealer’s revenues, it may be that the dealer has been given a ‘franchise.’ ” {Id. at 497.)
While the court not did conclusively state whether or not a “community of interest” could be found in the “marketing” of vehicles and related services, the grant of a “license” to use defendant’s trade name, the “investment” in parts and training of service employees, and the impact on plaintiffs “revenues” the loss of the business would impart, it is clear that cumulatively these were all relevant considerations.
The only other court decisions bearing on the issue of what constitutes a “community of interest” come from courts in other states. Obviously these decisions are neither binding nor reliable indicators of what the New York State Legislature intended when it drafted Vehicle and Traffic Law § 462 (6).
Nevertheless, this court does take note of the Third Circuit, United States Court of Appeals’ decision in New Jersey Am., Inc. v Allied Corp. (875 F2d 58 [3d Cir 1989]). In upholding the District Court’s grant of summary judgment in favor of the defendant, the Court of Appeals analyzed and discussed what should meaningfully constitute a “community of interest,” as it applied to the New Jersey Franchise Practices Act (NJ Stat Ann § 56:10-1 et seq.), in the context of determining whether there was, or was not, a franchise under the act in that case.
The plaintiff, New Jersey American, was an assembler of automobile brake pads and drum shoes, as well as a seller of the same components in the automotive replacement parts market. The defendant, Allied, manufactured Bendix brand brake linings which it supplied to the plaintiff for use with plaintiff’s disc pad and drum shoe assemblies. The District Court had ruled in favor of the defendant after concluding, as a matter of *1047 law, that plaintiff was not a franchisee of the defendant under the terms of their agreement. In reaching its determination and in the absence of “direction from the New Jersey Supreme Court,” the Third Circuit “devised ... a caliper for measuring putative inequality of bargaining power, which is what the community of interest test, in effect, seeks to measure.” (Id. at 59.)[8]
Citing an earlier Third Circuit decision,[9] the court spoke of the necessity of the putative franchisee demonstrating the existence of unequal bargaining power with the franchisor, making the former vulnerable to the latter’s “whim, direction and control.” (Id. at 62.) In addition, the court noted the importance of showing substantial capital investment by the franchisee in both tangible assets (e.g., real estate and/or improvements thereon and special equipment) useful only to produce the franchise product, and intangible assets (e.g., business good will and name association with the franchisor) the loss of which would substantially jeopardize the profitability of the franchisee. (Id.) The court also looked to whether the agreement placed limitations on the franchisee’s product line which could lead to post-contract opportunistic behavior by the franchisor, such as the loss, or threatened loss, of the product line, making the franchisee vulnerable to a forfeiture of expected return on capital investment. (Id.)
Other relevant questions included whether the agreement terms would create a reasonable belief in the minds of consumers that the franchisor’s connection with the franchisee was “symbiotic” and that it “vouche[d]” for the franchisee. (Id. at 61.) In contrast, the court analyzed whether both parties merely profited (mutually) from the association. (Id.)
Finally, the court noted that “license” granted to the putative franchisee was certainly an element but not necessarily *1048 persuasive standing alone. “[W]e are not persuaded that every licensee is a franchisee within the meaning of the New Jersey Act; that would make the community of interest element of the franchise definition superfluous.” (Id. at 63.)
The absence of New York State authority does not foreclose this court’s determination of the central issue: what are the elements of a franchise under the act and what tests should a court employ to resolve the legal issue when the facts are not in dispute? In the absence of clear legislative direction, this court must use its sound judgment, relying where appropriate on analogous, though not binding, authority from other jurisdictions that have carefully examined and ruled on the same, or similar, issues.
The approach of the Third Circuit is sound. After all, what would be the point of including the terms “license” and “community of interest” in Vehicle and Traffic Law § 462 (6) if a franchise could be nothing more than “a written arrangement for a definite or indefinite period . . . pursuant to which a franchised motor vehicle dealer purchases and resells or offers (as agent, principal, or otherwise) products associated with the name or mark or related components of the franchise” (as proposed by plaintiff in its mem of law at 9).
In order to prevail on a motion for summary judgment, the moving party “must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986] [citations omitted]). Failure to make that initial showing requires denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). However, once this showing has been made, the burden shifts to the party opposing the motion to “produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he [or she] rests his [or her] claim or must demonstrate [an] acceptable excuse” for his or her failure to do so (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). In making this determination, the evidence must be viewed in the light most favorable to the non-moving party (Pearson v Dix McBride, LLC, 63 AD3d 895 [2009]), and inferences that may be drawn therefrom must be accepted as true (Dykeman v Heht, 52 AD3d 767, 769 [2008]).
In the absence of conflicting or ambiguous facts regarding what was contained within the four corners of the agreement or *1049 what other terms may have existed or been contemplated by and between the parties, the question of whether the Wholesale Exclusive Agreement is a franchise agreement is an appropriate question for summary judgment. Based on all of the submissions of the parties as well as all of the foregoing discussion, this court concludes the Wholesale Exclusive Agreement executed by the parties did not create a franchise between them.
The agreement created no unequal bargaining power between SMS and JJLG. WThile potentially profitable to both parties, the acquisition of the Saleen Challenger by JJLG from SMS and JJLG’s concomitant right to sell the five contracted vehicles exclusively within the defined geographic area cannot be said to have made JJLG vulnerable to post-contract opportunistic behavior by SMS that would threaten JJLG’s profitability or capital investment cost recovery. Indeed, beyond purchasing one car from SMS, there isn’t even an allegation, much less proof, of a significant capital investment by JJLG in furtherance of, and reliance upon, the agreement.
JJLG was selling stock Dodge Challengers under its franchise with Chrysler long before the Saleen Challenger caught its eye. The relationship with Chrysler, the main business of JJLG, was, and would be, unaffected regardless of what happened or might have happened had SMS’s limited specialty production and sale of Saleen Challengers through JJLG panned out.
The agreement was potentially profitable to both parties. But JJLG committed no head long dive into the deep end in terms of its relationship with SMS. The most that can be said is that both parties merely waded into the pool’s shallow end and found the water too cold to go further.
The Wholesale Exclusive Agreement between plaintiff and the defendants does not demonstrate a community of interest even if it may arguably be said to grant a license. Having thus determined as a matter of law that no franchise, as defined by the act, was created, this court grants summary judgment to the defendants.
Ordered that plaintiff’s complaint is dismissed as a matter of law pursuant to CPLR 3212.

. “Saleen” refers to Saleen Automotive, Inc., the parent of SMS Signature Cars and SMS-Retail Corona. As set forth by affidavit of Stephen M. Saleen, “Saleen” is the trademark applied to each of the high-performance vehicles produced by SMS to identify and market the vehicle as such.

. There was a further complaint by JJLG that SMS did not appear at the New York Auto Show to promote the Saleen 570 Challenger, but that complaint is not part of the pleadings nor incorporated in the relief sought.

. There are a few sections of the act regarding interactions with consumers, or “retail buyers” (see e.g. Vehicle and Traffic Law §§ 464, 468, 471), but the facts of the instant matter do not in any way implicate consumer or retail buyer issues.

. The sole remedy sought by the plaintiff is such remedy as is afforded under the act, specifically Vehicle and Traffic Law § 463 (2) (p) governing unfair business practices by franchisors.

. As defined under Vehicle and Traffic Law § 462 (9).

. So to paraphrase, as proposed by plaintiff, a franchise would be found in a written arrangement pursuant to which a franchised motor vehicle dealer (JJLG) purchases and resells or offers products associated with the name or mark or related components of the franchise (between SMS as franchisor and JJLG as franchisee). But how is one to determine if a franchise exists under this definition without resort to analysis of some other term or terms? The only other terms within Vehicle and Traffic Law § 462 (6) which can provide an answer are the terms “license” and “community of interest.” As stated previously, a “franchisor” as defined in Vehicle and Traffic Law § 462 (8), is simply a “party to a franchise,” therefore, SMS is only a franchisor if it is a party to a franchise between it and JJLG and this cannot be determined within the alternative definition as reconstructed by the plaintiff.

. This court need not rewrite Vehicle and Traffic Law § 462 (6) to resolve the issue before it, and expressly declines to do so, though it should be noted that the definition, as written, makes perfect sense if the disjunctive “or” is read to modify only the phrase “by lease or otherwise” and not to modify virtually all that goes before those four words. Ultimately, how “and/or” fits into the definition, or should be regarded, may be an interesting exercise, but it will not alter the necessity of defining “franchise” by some term other than franchise. However one wishes to restate the definition, one must use the available terms within the section, and those terms are “license” and “community of interest.”

. In defining the term “franchise,” the New Jersey Franchise Practices Act (the New Jersey Act) under section 56:10-3 (a) employs, word for word, nearly identical language as that which is contained within Vehicle and Traffic Law § 462 (6). It must be noted, however, that there are significant differences. The New Jersey Act applies not to all franchises, but to those that meet certain criteria pegged to: (1) the amount of gross sales between the parties for the preceding 12 months; (2) the percentage of the gross sales derived from the franchise by the franchisee; and (3) a requirement that the franchisee establish or maintain a place of business within the state. Defendant did not, however, claim the plaintiff fell into the excluded class of franchises. Defendant claimed only that the agreement it had with plaintiff was not a franchise agreement.

. Colt Indus. Inc. v Fidelco Pump & Compressor Corp., 844 F2d 117 (3d Cir 1988).